LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty on a trial on an indictment that charged in pertinent part the following:
“LARRY D. NAPIER ... did, on or about December 9, 1982, unlawfully possess a controlled substance, to-wit: Pen-tazocine, in violation of the provisions of the Alabama Uniform Controlled Substances Act, a violation of § 20-2-70 of the Code of Alabama....”
In the brief of counsel for appellee, it is stated that the “Statement of the Facts as set forth in Appellant’s brief is substantially correct and is adopted” by appellee, except in two particulars, which would not be a hindrance to our acceptance as correct of the following parts of the Statement of the Pacts contained in appellant’s brief:
“Arthur Don Scott testified for the State on direct examination that he is employed with the Police Department for the City of Mobile and is a patrol officer. He has been employed in that capacity for approximately two years, nine months, and was so employed on the 9th day of December, 1982, at approximately 4:00 a.m.
“As he was sitting in his car -in the vicinity of Government and Conception Streets behind the Greyhound Bus Station, he received a dispatch over the radio that a burglary alarm was going off at the Royal Dog House Restaurant on Royal Street near the comer of Conti and Royal. He was between six and eight blocks away, or approximately a quarter of a mile away from the subject restaurant when he received the call. When he arrived at this restaurant he observed a broken window and two black males walking away rapidly approximately 30 or 40 feet from the business headed north on Royal Street.
“He detained one of the subjects, the Appellant, and gave him a pat-down frisk up against a car to assure that he had no weapons on him. At that point he felt what he thought was a pen and directed *646 the Appellant to remove it. What he thought was a pen was in fact a hypodermic syringe with a clear liquid substance in it. He could not remember if he removed the syringe from Appellant’s pants or jacket, but he does remember that it was from the Appellant’s right side.

“The syringe had a clear liquid in it but it was not even enough to fill a little teaspoon; and, was only about four or five small beads.”
The defendant’s testimony was similar to that of Officer Scott in many respects but different in the important material respect that defendant denied that the syringe referred to was ever in the possession of defendant. He disclaimed any knowledge of the syringe or its contents. He was investigated by the officer as to his connection with the burglary or attempted burglary of the Royal Dog House Restaurant and a photograph and fingerprints were taken of him by the investigating officer. According to the accepted Statement of Facts in brief of counsel for appellant, the following occurred:
“After the tests were concluded Officer Scott took him back to the car after patting him down again. As the officer went to open the door to put him inside he looked in and saw a syringe on the back seat. At that point the officer picked up the syringe and said ‘What’s this here?’ He [defendant] hadn’t seen the syringe on the back seat when he was in the car the first time. He doesn’t know how the syringe got on the back seat. All he knows is that he was charged with Possession of Pentaeozine three weeks later. Officer Scott was inside with him when the test was going on.
“On cross-examination he testified that he does in fact know what Talwin is; and, what T’s and Blues are. He’s heard about folks who cook it in a bottle cap and inject it in their arms. He has seen syringes like the one marked as a State’s exhibit previously.”
Ms. Sylvia Bryant, a criminalist employed by the Mobile Police Department Crime Lab, who defendant’s counsel stipulated was certainly “very qualified in this particular area she’s going to testify on,” testified as to the results of her analysis of the syringe and its contents. We quote the following parts of her testimony:
“A. I performed a U.V. Spectropheme-try which showed that the contents of the syringe had the same curve, U.V. curve, given by that of the combination of pentazocine and tripelennamine.
“Q. And is pentazocine a controlled substance in the State?
“A. Yes, it is.
“Q. And did you perform any other tests on the substance?
“A. Yes, I also did thin-layer chromatography running the substance from the syringe by extracting, taking the substance again, just from the syringe and running it against a known, which was the combination of the pentazocine and the tripelennamine, and the thin-layer chromatography, it was positive for both pentazocine and tripelennamine.
“Q. What is pentazocine?
“A. Pentazocine is an analgesic considered a narcotic type analgesic, used in moderate to severe pain.
“Q. And what is tripelennamine?
“A. It’s an antihistamine.
“Q. Is it controlled?
“A. No, it’s not controlled.
“Q. Do you have occasion to see these two substances in combination frequently?
“A. Yes.
“Q. Do you recall how much fluid was in the syringe that you performed your test on?
“A. Approximately 1 ml. This is the type—
“Q. One milliliter?
“A. Yes. This is the type, it’s not marked in milliliters. I think it’s marked in units basically.
“Q. Is that much substance?
“A. No, not very much.
*647 Counsel for appellant presents three issues in his brief which we now consider.
I.
Appellant urges in his brief that defendant’s “Motion to Suppress the evidence found on the person” of defendant should not have been denied by the trial court. This issue is argued extensively by appellant’s brief, in which a large number of authorities are cited pertaining to a variety of situations pertaining to the search of the person of an individual and as to what was found and sometimes seized by law enforcement authorities in conducting a search of the person of individuals suspected of criminal activity. We fail to find in any of the authorities cited in the brief a precedent for holding that the motion to suppress in the instant case should have been granted. A gist of the argument on the point in appellant’s brief is to be found in two paragraphs of the brief, as follows:
“From a review of the evidence as a whole, and the testimony at the suppression hearing, it affirmatively appears that the officer had very little ground to suspect or believe that the Appellant had anything to do with the broken window at the restaurant, other than his mere presence in the vicinity. He also had no cause to believe that the Appellant was armed and dangerous, as there was nothing in the circumstances to indicate it. Further, he admits that he thought the object that he felt on the Appellant’s person was a pen; and consequently, had no probable cause to believe that it was a dangerous weapon which would justify a seizure.
“It is the Appellant’s second contention that it was error to allow into evidence the syringe seized from the Appellant on the ground that it was a product of an illegal arrest. As stated above, the questioned stop, search, and seizure was based on mere suspicion. Yet the officer admits that the Appellant was being detained so that he could be questioned with regard to the subject burglary, i.e., he was under arrest. The several decisions and statutes may be instructive.”
Each particular part of the activity of Officer Scott that eventually led to the search of defendant and the seizure of the syringe should be considered in the light of the facts existing at the time such step was taken. We cannot agree with the conclusion of appellant’s attorney that when defendant was accosted by the officer, the officer had very little ground to suspect or believe that defendant “had anything to do with the broken window at the restaurant, other than his mere presence in the vicinity.” Officer Scott’s testimony, that one of the persons was “walking very rapidly away from the business” that apparently had been burglarized or attempted to be burglarized, is to the contrary. We think also that the very nature of the crime or attempted crime of burglary, which with much force had caused the window to be broken, would be a good ground for belief that persons participating in the apparent crime would likely have been “armed and dangerous.” It is to be noted that it was not until after Officer Scott conducted the “pat-down frisk” of defendant, that he discovered what he thought was a pen in the pocket of defendant was “a syringe with a liquid inside.”
We disagree with appellant’s contention as found in the first issue in brief of counsel for appellant.
II.
The following is the caption of the second issue presented in brief of counsel for appellant:
“IT WAS REVERSIBLE ERROR TO DENY DEFENSE MOTIONS FOR MISTRIAL DUE TO THE PROSECUTOR’S DELIBERATE ATTEMPT TO GET BEFORE THE JURY EVIDENCE OF PRIOR ARRESTS AND/OR CONVICTIONS OF THE APPELLANT FOR DRUG RELATED OFFENSES SIMILAR TO THE ONE FOR WHICH HE WAS ON TRIAL.”
This issue is directed at a part of the cross-examination of the defendant by the prose *648 cuting attorney, wherein after the prosecuting attorney had asked the defendant as to his knowledge of or acquaintance with “talwin, pentazocine and Tripelennamine, T’s and Blues” and he had responded to some of such questions by the prosecuting attorney, the following occurred:
“A. I heard of talwin, only time I heard Pentazocine the charge I be getting.
“Q. I’m sorry.
“A. These charges I be getting y’all give me—
“Q. This charge?
“A. Yeah.
“Q. Or did you say these charges?
“A. That’s right.
“Q. Which one was it?
“A. The other charge out — they charge me out there in Prichard with.
“MR. ORSO: Judge, may I approach the bench?
“(Bench conference:)
“MR. ORSO: Judge, I move for a mistrial. The D.A. knows he has been charged with other things. He is trying to get that in.
“THE COURT: Pardon me.
“MR. ORSO: I move for a mistrial. She’s trying to get in prior arrests without convictions. She knows cause—
“THE COURT: I can’t hear you.
“MR. ORSO: I’m sorry. I’m trying— She knows he has some prior arrests because she tried the case with me.
“THE COURT: You know a prior arrest without conviction is not admissible.
“MS. BEDWELL: Yes, sir.
“THE COURT: Conduct it accordingly.
“MR. ORSO: Could I have a ruling on that for the record?
“THE COURT: Overruled for the record. Or deny your motion.
“(Open Court:)
“Q. You have — and it’s your testimony that you were — Where had you been? Let me ask you that. Where had you been this evening at four o’clock in the morning?
“A. We had been over there about two or three hours in the Square, been—
“Q. Where, in the Square?
“A. (Witness nodding.)”
We are of the opinion that the prosecuting attorney was dangerously close to giving rise to a valid ground for a motion for a mistrial as shown by the quoted text and the context of the quoted text of her cross-examination of defendant, but she is to be saved from the charge made by counsel for defendant and appellant under the circumstances of this particular case, for the reason that it was incumbent upon the State to prove not only the possession by defendant of the controlled substance, but also that he was criminally knowledgeable of the fact that he was in possession thereof. The minute amount of the substance, one-thousandth of a liter thereof, furnished more valid ground for the close questioning of defendant on the point than if there had been a large quantity thereof.
III.
Soon after, but the transcript does not show how soon, the case had been submitted to the jury and it had commenced its deliberation, the jury sent word to the trial judge that it had a question to ask. The jury then returned to the courtroom and the following occurred:
“THE COURT: Who is your foreman, please? I understand you have a question.
“THE FOREPERSON: We have two. First question we’d like for you to clarify for us is what constitutes a reasonable doubt, and the second one we want to know the procedure that trials — that a man comes to trial. Is there always a grand jury before there’s a trial?
“THE COURT: Let me get my charge and I’ll read on reasonable doubt. Let me see the two attorneys.
“(Pause.)
“THE COURT: Okay. As far as the question regarding the indictment, I charge you that the indictment in this case is not evidence against the defendant. It is merely the formal method under our Constitution by which a de *649 fendant is accused of a crime and placed on trial. It provides no proof nor presumption nor inference that defendant is guilty of the offense charged therein. Does that answer your question?
“THE FOREPERSON: So, the grand jury hands down the indictment? Do I understand that? What we wanted to know is if the defendant has come before a grand jury before and did the grand jury consider the evidence?
“MR. ORSO: I’ve stated my objections in chambers.
“THE COURT: Let me see y’all.
“MS. BEDWELL: Maybe if you would read the indictment. I don’t know if that would help them or not.
“THE COURT: I have read the indictment previously to you and it charges the grand jury of said County charge before the finding of this indictment, Larry D. Napier, whose name to the grand jury is otherwise unknown than as stated, then the charge. And as I’ve told you that is not to create any presumption, inference, or anything. It’s just the formal way to get him on trial. [Omitted now from this quotation is about a page of the transcript of instructions to the jury by the trial judge that constitutes substantially a repetition of what he charged the jury in his oral charge before the case was submitted to the jury. We now quote instructions in reply to the questions of the foreperson.]
“Does that answer your question on what reasonable doubt is?
“THE FOREPERSON: That answers that.”
Thereupon, the following occurred out of the presence of the jury:
“THE COURT: Okay, for the record, before charging the jury as I have just done I had a conference with the district attorney and the defense attorney and the defense attorney stated that he objected to me charging on these two aspects of the case because it was putting undue emphasis on the two parts of the charge and not the entire charge; is that correct?
“MR. ORSO: Yes, sir. I asked you not to—
“THE COURT: And I granted your exception and told you that I was going to go ahead and charge on it.
“MR. ORSO: Yes, sir. I asked you not to give either one of the charges you just did. I felt you had already covered those in your charge to the jury and that going over those again put undue emphasis on a couple of very small parts of your charge and I didn’t think they needed to be covered again, and I think it’s prejudicial, highly prejudicial, and I object to those.
“THE COURT: And I’m going to overrule your exception and note it for the record.”
The transcript shows immediately after what we have last quoted that the jury returned to the courtroom with a unanimous verdict finding the defendant “guilty as charged in the indictment.”
The final contention for a reversal in appellant’s brief is directed at that which we have attempted under III above to reproduce. We are unable to fathom the mind of the foreperson or any other member of the jury as to what was meant by the double-barrel question as to whether “the defendant has come before a grand jury before and did the grand jury consider the evidence.” Especially puzzling is what was meant by the word “before” and whether it was used in the sense of an adverb, a preposition, or a conjunction. Perhaps it would have been better for the trial judge to have either definitely declined to answer the question, as requested by defendant’s counsel, or to have instructed the jury to return to the jury room and take care to formulate in writing the question or questions the jury desired that the trial court answer. We are confident that nothing in the court’s answer to the questions was legally or otherwise incorrect. Notwithstanding the apparent fact that promptly after the jurors returned to the jury room they reached a unanimous verdict that defendant was guilty of the crime as charged in the indictment, we are unable *650 to find any harm to defendant in what the court said in answer to the questions of the foreperson of the jury. We have considered, but we do not agree with any of the following tripartite contention in the brief of counsel for appellant:
“... When the foreperson came back in requesting the court to clarify whether or not the Defendant had once before come before the grand jury; and, whether or not that grand jury considered the evidence, it was apparent that they were confused by the prosecutor’s closing argument whereby she insinuates that the Defendant didn’t tell the same story previously.
“(2) Reversal is in order, however, because the trial court has put improper emphasis on a part of its oral charge which was very thorough; and, the matters covered in the additional instructions to the jury appear to answer the question ‘has the Defendant come before the grand jury before?’, in the affirmative. The error, of course, is compounded, and made even more prejudicial than it would be in any event, by the prosecutor’s statements in closing deliberately intended to mislead the jurors.
“(3) ... A matter not reflected in the record is the fact that the jury had been out close to three hours when it came back asking the court for additional instructions; yet, stayed out only five minutes or so, after the additional instructions were given, before returning the verdict of guilt.”
For the reasons set out above, the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Court Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.